**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**AIMEE SZWALLA,**

                            **Plaintiff,**

    **vs.**                                   **3:13-CV-713**
                                         **(MAD/DEP)**

**TIME WARNER CABLE, LLC and**
**TIME WARNER ENTERTAINMENT**
**COMPANY, L.P.,**

                           **Defendants.**
_____

**APPEARANCES:**                     **OF COUNSEL:**

**POPE, SCHRADER & POPE, LLP**     **ALAN J. POPE, ESQ.**
2 Court Street, 4th Floor
P.O. Box 510
Binghamton, New York 13902
Attorneys for Plaintiff

**BOND, SCHOENECK & KING, PLLC**     **JONATHAN B. FELLOWS, ESQ.**
One Lincoln Center                   **SUZANNE O. GALBATO, ESQ.**
Syracuse, New York 13202
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiff commenced this action on June 20, 2013, alleging sexual harassment, hostile

work environment, and retaliation by Defendants in violation of Title VII of the Civil Rights Act

("Title VII") in connection with Plaintiff's employment as an account executive in Defendants'

Vestal, New York office. _See_ Dkt. No. 1. Presently before the Court is Defendants' motion for

summary judgment. _See_ Dkt. No. 30. Plaintiff opposes the motion. _See_ Dkt. No. 35.

## II. BACKGROUND

Plaintiff began employment with Defendants on September 10, 2001 as an account executive in Defendants' Vestal, New York office. Dkt. No. 30-10 at ¶ 1. Plaintiff's position involved selling Defendants' "Business Class" services to businesses in the Binghamton, New York area. *Id.* at ¶ 9. As an account executive, Plaintiff earned a base salary and could earn sales commissions. *Id.* at ¶ 10. Defendants required its account executives, including Plaintiff, to meet monthly sales quotas. *Id.*

At all times relevant to Plaintiff's claims, Defendants maintained policies prohibiting unlawful discrimination and harassment based on gender. *See id.* at ¶ 4; Dkt. No. 30-2 at 2-3. Defendants also maintained a Standards of Business Conduct policy that prohibited harassment and sexual harassment and instructed employees to report instances of possible discrimination or harassment to Defendants' human resources, legal, or compliance offices. *See* Dkt. No. 30-10 at ¶ 5; Dkt. No. 30-2 at 5-14. In addition, Defendants had an Open Door Process through which employees could report concerns to their local management or local human resources department or to Defendants' Corporate Employee Relations Department ("Employee Relations") in Charlotte, North Carolina. *See* Dkt. No. 30-10 at ¶ 6; Dkt. No. 30-2 at 30-32. Plaintiff was trained on and acknowledged receipt of these policies. Dkt. No. 30-10 at ¶ 7.

In or about July 2009, shortly after Plaintiff returned from maternity leave, Plaintiff complained to human resources that her manager, Paul Noyd, had said that taking maternity leave was like taking a vacation, in reference to Plaintiff's needing to meet her sales quotas. *See id.* at ¶ 16; Dkt. No. 30-5 at 23. In response to Plaintiff's complaint, Barbara Petitto, Defendants' director

of human resources in Syracuse, New York, counseled Mr. Noyd that his comment was inappropriate. Dkt. No. 30-7 at 49-50; Dkt. No. 30-9 at 14-16.[1]

Plaintiff also alleges that shortly after this incident, she attended a meeting at which another account executive, Dana Thurston, made an inappropriate comment to her in front of Mr. Noyd. *See* Dkt. No. 30-5 at 41. Specifically, Plaintiff alleges that Mr. Thurston commented, "[y]ou look nice today" and turned to Tony DiPietro, the vice president of Defendants' Business Class, and said, "Go ahead, Tony. Take a look. Take a look at Aimee." *Id.* Plaintiff further alleges that when she spoke to Mr. Noyd about the inappropriateness of Mr. Thurston's comment following the meeting, Mr. Noyd taunted Plaintiff about reporting the comment to human resources and refused to take Plaintiff to human resources to make a report. *See id.* at 41-42. Plaintiff contends that she then reported Mr. Thurston's comments and Mr. Noyd's response to Ms. Petitto. *See id.* at 42. Ms. Petitto and Mr. Noyd do not recall Plaintiff complaining about Mr. Thurston's comments to them. *See* Dkt. No. 30-7 at 29; Dkt. No. 30-9 at 90.

Plaintiff's monthly sales quota for July 2009 was $4,500. Dkt. No. 30-10 at ¶ 12. Defendants required Plaintiff to meet only fifty percent of her monthly sales quota that month. *Id.* at ¶ 14; Dkt. No. 30-2 at 34. Plaintiff actually sold $294 worth of services in July 2009. Dkt. No. 30-10 at ¶ 13; Dkt. No. 30-2 at 34. Defendants required Plaintiff to meet sixty-five percent of her monthly sales quotas in August, September, and October 2009, seventy-five percent of her monthly sales quota in November 2009, and eighty percent of her monthly sales quota in

---

[1] Although Plaintiff disputes that Ms. Petitto counseled Mr. Noyd regarding the inappropriateness of his comment, Plaintiff's only basis for disputing that this conversation occurred is the fact that Defendants were unable to produce a record of the conversation. *See* Dkt. No. 35-6 at ¶ 53. As both Ms. Petitto and Mr. Noyd testified at their depositions that Ms. Petitto spoke to Mr. Noyd regarding his comment, and Plaintiff has produced no evidence to the contrary, the fact that this conversation took place is not genuinely in dispute.

December 2009.  Dkt. No. 30-10 at ¶ 15; Dkt. No. 30-2 at 34.  Plaintiff did not meet her reduced

monthly sales quotas in August, September, or October 2009.  Dkt. No. 30-2 at 34.  On November

2, 2009, Mr. Noyd informed Plaintiff in writing that if Plaintiff did not meet her reduced monthly

sales quota for the month of November 2009, Plaintiff would progress to the termination stage of

Defendants' progressive employee discipline procedure.  *Id.*[2]

Around April 30, 2010, Defendants reassigned Plaintiff to report to another manager,

Cory Karanik.  Dkt. No. 30-10 at ¶ 19.  Mr. Karanik worked out of Defendants' Syracuse, New

York office.  *Id.* at ¶ 20.  Mr. Karanik was trained on Defendants' anti-harassment, anti-

discrimination, and Open Door policies.  *Id.* at ¶ 8.  Plaintiff and Mr. Karanik had face-to-face

contact approximately ten times in an eleven-month period.  *Id.* at ¶ 21.  According to Plaintiff,

on these occasions, Mr. Karanik made inappropriate comments regarding her appearance and

body.  *See id.* at ¶ 22; Dkt. No. 30-5 at 46.  In addition, on June 11, 2010, after an in-person

meeting with Plaintiff, Mr. Karanik sent Plaintiff a text message that read "Your [*sic*] very

distracting."  Dkt. No. 30-10 at ¶ 23.  Plaintiff responded with a text message that read "Sorry"

and included a colon and a parenthesis to indicate a smiley face.  *Id.* at ¶ 24.  Mr. Karanik sent

Plaintiff an additional text message that read "I'll do my best to behave."  *Id.* at ¶ 25.

On May 23, 2011, Plaintiff notified Employee Relations of Mr. Karanik's comments and

text messages from 2010.  *See id.* at ¶ 27; Dkt. No. 30-2 at 36.  Plaintiff also informed Employee

---

[2] Defendants' corrective action process for employee discipline in place in 2009 involved four stages: (1) Stage 1 counseling; (2) Stage 2 written warning; (3) Stage 3 final warning; and (4) Stage 4 termination.  *See* Dkt. No. 30-7 at 45-47.  Mr. Noyd's letter to Plaintiff was a Stage 3 final warning.  Dkt. No. 30-2 at 34.  Plaintiff contends that she did not receive Stage 1 counseling or a Stage 2 written warning prior to this letter.  *See* Dkt. No. 35-6 at ¶¶ 60-61.  Ms. Petitto indicated that she "under[stood] there was coaching done" with Plaintiff, Dkt. No. 30-7 at 47, but could not produce any documentation that Stage 1 and Stage 2 actually occurred for Plaintiff's poor sales performance prior to the November 2 Stage 3 final warning, *see* Dkt. No. 35-6 at ¶ 60.

Relations that Mr. Karanik had attempted to kiss Plaintiff at a café following a funeral for a colleague's family that Plaintiff and Mr. Karanik attended together. Dkt. No. 30-2 at 36. Defendants immediately suspended Mr. Karanik pending investigation of Plaintiff's complaint. Dkt. No. 30-10 at ¶ 31. After investigation, Ms. Petitto and Employee Relations determined that Mr. Karanik had encouraged Plaintiff not to report his behavior to human resources. *See* Dkt. No. 30-8 at 50. Defendants therefore terminated Mr. Karanik on June 16, 2011 for violating their Open Door policy. *See id.* at 50-51; Dkt. No. 30-10 at ¶ 32.

Plaintiff went on leave from the time she reported Mr. Karanik in May 2011 until approximately December 2011. Dkt. No. 30-10 at ¶ 33. When Plaintiff returned to work, Defendants assigned her to report to Michael Stanton, Director of Sales in Defendants' Syracuse office. *See id.* at ¶ 35; Dkt. No. 30-8 at 54-57. Plaintiff went on maternity leave from approximately March 7, 2012 to May 18, 2012. *See* Dkt. No. 30-1 at ¶¶ 27-28. When she returned from maternity leave, Defendants afforded Plaintiff a "ramp up" period of reduced sales quotas. *See* Dkt. No. 30-10 at ¶ 36. Specifically, Defendants required Plaintiff to meet twenty-five percent of her sales quotas for June, July, and August 2012, fifty percent of her sales quota for September 2012, and seventy-five percent of her sales quota for October 2012. *Id.*

Upon her return, Plaintiff complained to Ms. Petitto about reporting to Mr. Stanton, which Plaintiff viewed as a disadvantage because she did not feel like part of the Vestal sales team and missed the opportunity to participate in team meetings by having to report to a manager remotely. *See* Dkt. No. 30-5 at 70-71. Ms. Petitto thereafter reassigned Plaintiff to report to Mr. Noyd at Plaintiff's request. *See id.* at 71. Plaintiff continued to fail to meet her sales quotas after she was reassigned to Mr. Noyd. *See id.* at 75.

Around this time, Plaintiff also expressed to Ms. Petitto that she was not happy conducting outside sales and face-to-face visits to potential customers. *See* Dkt. No. 30-8 at 60. Plaintiff told Ms. Petitto that part of her concern with respect to "[b]eing out on the streets" was that she feared Mr. Karanik was following her or driving by her house. *See id.* at 60-61; Dkt. No. 30-5 at 58-59. Ms. Petitto directed Plaintiff to other job openings with Defendants, including inside sales opportunities in Defendants' Syracuse office. *See* Dkt. No. 30-5 at 67. Plaintiff unsuccessfully applied for media sales and hospital sales positions with Defendants. *See id.* at 74. In or about February 2013, Plaintiff transferred to a customer service representative position in Defendants' Vestal call center. Dkt. No. 30-10 at ¶ 46. Plaintiff's base salary, health benefits, and reduced cable services remained the same as in her prior account executive position. *Id.* at ¶ 47.[3]

From April 18, 2013 through October 24, 2013, Plaintiff progressed through the four stages of Defendants' corrective action process for employee discipline based on Plaintiff's excessive tardiness and absenteeism, including documented counseling on April 18, 2013, a written warning on May 10, 2013, a final written warning on July 10, 2013, and a second final written warning on October 24, 2013. *Id.* at ¶ 48. On November 5, 2013, Defendants terminated Plaintiff because of her continued pattern of attendance violations. *Id.* at ¶ 50.

On June 14, 2011, Plaintiff filed a complaint with the New York State Division of Human Rights ("Division of Human Rights"), which alleged gender discrimination and hostile work environment charges against Defendants and Mr. Karanik. *Id.* at ¶ 37. On July 12, 2012, Plaintiff filed a second complaint with the Division of Human Rights, alleging that Defendants subjected her to retaliation for filing her initial complaint by assigning her to report to Mr. Stanton. *Id.* at ¶

---

[3] Plaintiff's potential commission decreased substantially from the account executive position. *See* Dkt. No. 30-5 at 79.

38.  On January 8, 2013, the Division of Human Rights made a "no probable cause" determination pertaining to Plaintiff's retaliation claims and dismissed Plaintiff's retaliation complaint.  *Id.* at ¶ 44.  On March 22, 2013, Administrative Law Judge Robert M. Vespoli dismissed Plaintiff's gender discrimination and hostile work environment charges in a Recommended Findings of Fact, Opinion and Decision, and Order.  *Id.* at ¶ 40.  The Division of Human Rights adopted the recommended decision and order on April 30, 2013.  *Id.* at ¶ 41.

The Equal Employment Opportunity Commission ("EEOC") issued Plaintiff a dismissal and notice of right to sue regarding her sexual discrimination and hostile work environment complaint on March 20, 2013.  *Id.* at ¶ 43.  On May 17, 2013, the EEOC issued Plaintiff a dismissal and notice of right to sue regarding her retaliation complaint.  *Id.* at ¶ 44.  Plaintiff commenced this action on June 20, 2013, asserting claims of sexual harassment based upon a hostile work environment and retaliation in violation of Title VII.  *See* Dkt. No. 1.

## III. DISCUSSION

**A.**     **Summary Judgment Standard**

A court may grant a motion for summary judgment only if it determines "that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36-37 (quotation and other citation omitted).  The movant has the burden of showing that no genuine factual dispute exists, and "where the movant 'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, '"even if no opposing evidentiary matter is presented,"' for the

non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 160 (1970)).

In assessing the record to determine whether a genuine issue of material fact exists, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36. A party opposing a motion for summary judgment may not simply rely on the assertions in its pleading, but rather must "by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)). "If the record contains concrete evidence from which a rational trier of fact could render a reasonable verdict in favor of the non-moving party, summary judgment is improper." *Gonzalez v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 349 (S.D.N.Y. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**B.    Hostile Work Environment**

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff seeking relief for sex discrimination [under Title VII] can proceed under two theories: (1) 'quid pro quo' and (2) 'hostile work environment'." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992) (citing *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 64-65 (1986)). Here, Plaintiff proceeds solely on a hostile work environment theory.

In order to prove sexual harassment in violation of Title VII based upon a hostile work environment, a plaintiff must prove "(1) that she is a member of a protected group; (2) that she was the subject of unwelcome advances; (3) that the harassment was based upon her sex; and (4) that the harassment affected a term, condition or privilege of employment." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir. 1993). As to the fourth element, "the harassment must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment." *Id.* "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

> However, an affirmative defense is available when the employer does not take any tangible employment action in connection with the harassment. This defense examines the reasonableness of the conduct of both the employer and the victimized employee. Specifically, the Supreme Court held that "[t]he defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001) (internal citations omitted) (quoting *Faragher*, 524 U.S. at 807; *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

In the present matter, Defendants assert that "Time Warner Cable is entitled to summary judgment because Ms. Szwalla did not suffer any adverse employment action in connection with

the alleged harassment by her supervisor and therefore cannot prove all of the required elements of a Title VII violation." Dkt. No. 30-11 at 12. However, an adverse employment action is not a required element of a hostile work environment claim. As set forth above — and as Defendants acknowledge — Plaintiff must prove only that the harassment was sufficiently severe to affect a term, condition, or privilege of her employment, not that she suffered a tangible adverse employment action in connection with the harassment. *See id.* (setting forth the requisite elements of a hostile work environment claim). Defendants do not otherwise dispute Plaintiff's ability to prove the requisite elements of a hostile work environment claim based on Mr. Karanik's harassment.

However, Defendants argue that they are entitled to the *Faragher/Ellerth* defense from vicarious liability for Mr. Karanik's harassment. *See* Dkt. No. 30-11 at 12-19. Specifically, Defendants contend that their anti-harassment policies and complaint procedures and swift action in response to Plaintiff's reporting Mr. Karanik's harassing behavior demonstrate that Defendants exercised reasonable care to prevent and correct sexual harassment. *See id.* at 13-15. Defendants further contend that Plaintiff unreasonably failed to avail herself of Defendants' preventive or corrective measures by failing to report Mr. Karanik's harassment for nearly one year. *See id.* at 15-19. Plaintiff argues that she has proffered sufficient evidence that Defendants' policies were ineffective and that her delay in reporting Mr. Karanik was reasonable to deprive Defendants of the *Faragher*/*Ellerth* defense. *See* Dkt. No. 35-7 at 14-19.[4]

### 1. Defendants' Exercise of Reasonable Care to Prevent and Correct Harassment

"An employer need not prove success in preventing harassing behavior in order to

---

[4] The parties appear to agree that Defendants may raise the defense because Mr. Karanik's harassment of Plaintiff did not culminate in a tangible adverse employment action. *See Faragher*, 524 U.S. at 808.

demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) (citing *Faragher*, 524 U.S. at 807). "Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense." *Id.* Courts have also found evidence that an employer reacted promptly and appropriately to the filing of a harassment complaint probative of the employer's exercise of reasonable care to prevent and correct harassment. *See, e.g.*, *id.* (finding that an employer exercised reasonable care to prevent and correct sexually harassing behavior where it had an anti-harassment policy with a complaint filing procedure and undisputably "endeavor[ed] to investigate and remedy problems reported by its employees"); *Finnerty v. William H. Sadlier, Inc.*, 176 Fed. Appx. 158, 162 (2d Cir. 2006) (concluding that an employer exercised reasonable care as a matter of law based in part on the employer's investigation and punishment of a harassing supervisor within one week of the employee's complaint); *Gonzalez*, 262 F. Supp. 2d at 354-55 (finding that an employer's prompt response to an employee's harassment complaint was "'sufficient to remove any question of fact as to [the employer's] liability'" for a supervisor's harassment (quoting *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp. 2d 506, 525 (S.D.N.Y. 2000))).

Here, it is undisputed that Defendants had in place anti-harassment policies that encouraged employees to report harassment, including an avenue for reporting harassment that bypassed the harassing supervisor, and that Defendants provided Plaintiff and her supervisors with the policies and related training. *Cf. Faragher*, 524 U.S. at 808 (concluding as a matter of law that an employer did not exercise reasonable care to prevent supervisors' harassing conduct where the employer had failed to disseminate its anti-harassment policy to the supervisors and

employee being harassed and did not assure employees that harassing supervisors could be bypassed in registering complaints). Plaintiff argues that Defendants have nonetheless failed to satisfy the first prong of the *Faragher/Ellerth* defense because its anti-harassment policies and complaint procedure were ineffective. As Defendants correctly assert, an employer is not required to prove that its anti-harassment policies and procedures were effective in order to satisfy the first element of the defense. *See* Dkt. No. 36 at 6; *see also Caridad*, 191 F.3d at 295 (explaining that success in preventing harassment is not required to demonstrate that an employer exercised reasonable care in attempting to prevent and correct harassment).

To the extent that Plaintiff argues that Defendants have failed to prove that they exercised reasonable care in preventing and correcting harassing behavior because they failed to follow their stated anti-harassment policies and procedures, Plaintiff's argument is not supported by the record. It is undisputed that following Plaintiff's complaint regarding Mr. Karanik on May 23, 2011, Defendants immediately suspended Mr. Karanik pending investigation. It is also undisputed that Defendants promptly initiated an investigation and terminated Mr. Karanik on June 16, 2011. Furthermore, as discussed above, the record establishes that following Plaintiff's complaint regarding Mr. Noyd's maternity leave comment, Defendants counseled Mr. Noyd and transferred Plaintiff to another manager. *See supra* n.1.[5]

---

[5] Plaintiff also argues that Defendants failed to act in response to her complaint about Mr. Noyd's inaction in the face of Mr. Thurston's alleged inappropriate comments to Plaintiff in front of Mr. Noyd. *See* Dkt. No. 35-7 at 5. However, in her deposition testimony, Plaintiff acknowledged that Defendants transferred her off of Mr. Noyd's team in response to her second complaint against Mr. Noyd. *See* Dkt. No. 30-5 at 42. Plaintiff's contention that Defendants failed to implement any corrective action in response to her complaints is thus belied by Plaintiff's own testimony. Furthermore, although Plaintiff may believe that her complaints warranted a more severe response from Defendants, "'nothing gives her the right to choose the penalty for her harasser.'" *Gonzalez*, 262 F. Supp. 2d at 355 (quoting *Wahlstrom*, 89 F. Supp. 2d at 526). As the Second Circuit has recognized, "not every response to a complaint should take the form of

(continued...)

As evidence that Defendants did not enforce their stated anti-harassment policies and procedures, Plaintiff points to the affidavits of Jon Putrino and Joseph J. Sculley, Jr., who were employed in Defendants' Vestal office during the time relevant to Plaintiff's claims. Mr. Putrino, who was employed by Defendants for approximately sixteen years, indicated that Defendants' human resources department "seldom responded to any serious inquiry or complaint" and "did little or nothing to support anyone in need or with a complaint." Dkt. No. 35-2 at 1, 3. By way of example, Mr. Putrino described an incident in which he reported a female customer's complaint that a technician made inappropriate sexual references to her looks during a home service visit to human resources. *See id.* at 2. According to Mr. Putrino, he "did not hear anything more about this serious complaint" and assumed human resources did not properly investigate or deal with the technician because approximately one year later, a second female customer filed a complaint accusing the technician of sexually inappropriate comments and touching. *See id.*[6]

Similarly, Mr. Sculley indicated that he "experienced various situations where the Open Door policy seemed to be discouraged and situations where an employee complained about a manager or supervisor, but nothing was done to investigate or deal with such a complaint." Dkt. No. 35-3 at 1. Mr. Sculley did not identify a specific instance in which Defendants failed to investigate or deal with a particular complaint. *See id.* at 1-2.

Plaintiff also points to the fact that internal spreadsheets identifying complaints to human

_____

[5](...continued)
discharge," and an employer's response short of termination may be appropriate if it is "sufficient to make [the harassing supervisor] aware that the harassment would not be tolerated on [the employer's] premises." *Kotcher*, 957 F.2d at 63. Notably, Plaintiff later requested to return to Mr. Noyd's team, a request that Defendants accommodated. *See* Dkt. No. 30-5 at 70-71.

[6] Mr. Putrino also described an instance in which human resources did not enforce its policy forbidding the wearing of "dew-rags" against a particular technician despite the filing of a complaint regarding the technician's attire. *See id.* at 3.

resources for the years 2009, 2010, and 2011 do not include Plaintiff's complaints against Mr. Noyd and Mr. Karanik as proof that Defendants' anti-harassment policies and procedures were ineffective. *See* Dkt. No. 35-7 at 15; Dkt. No. 35-1.

The conclusory assertions of Mr. Putrino, Mr. Sculley, and Plaintiff that Defendants' anti-harassment policies were generally not enforced are insufficient to overcome the undisputed record evidence that Defendants promptly investigated and responded to complaints of sexual harassment.[7] Moreover, although the fact that Plaintiffs' complaints about Mr. Karanik and Mr. Noyd were not tracked on Defendants' internal log of human resources complaints may demonstrate lack of effective documentation of harassment claims, it does not evidence that Defendants failed to reasonably respond to complaints, especially in light of the undisputed record evidence that Defendants timely reacted to Plaintiffs' complaints. Accordingly, the Court finds that Defendants have satisfied the first element of the *Faragher/Ellerth* affirmative defense.

### 2. *Plaintiff's Failure to Take Advantage of Preventive or Corrective Opportunities*

As to the second prong of the *Faragher/Ellerth* affirmative defense,

> while proof that an employee failed to fulfill [his or her] corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher*, 524 U.S. at 807-08.

> Once an employer has satisfied its initial burden of demonstrating that an employee has completely failed to avail herself of the

---

[7] Although Mr. Putrino described an incident in which he assumes that Defendants took no action in response to a customer's complaint of sexual harassment by an employee, he admittedly has no firsthand knowledge of how Defendants in fact responded to the complaint. *See* Dkt. No. 35-2 at ¶ 5. Mr. Putrino's assertion that Defendants did not enforce their policy against dew-rags, even if true, is not probative of Defendants' efforts to prevent and correct harassment.

> complaint procedure, the burden of production shifts to the
> employee to come forward with one or more reasons why the
> employee did not make use of the procedures. The employer may
> rely upon the absence or inadequacy of such a justification in
> carrying its ultimate burden of persuasion.

*Leopold*, 239 F.3d at 246. In order for an employee's reluctance to report harassment to preclude

the employer's affirmative defense, "it must be based on apprehension of what the employer

might do, not merely on concern about the reaction of co-workers," and must be "based on a

credible fear that [the employee's] complaint would not be taken seriously or that she would

suffer some adverse employment action as a result of filing a complaint." *Caridad*, 191 F.3d at

295. "A credible fear must be based on more than the employee's subjective belief. Evidence

must be produced to the effect that the employer has ignored or resisted similar complaints or has

taken adverse actions against employees in response to such complaints." *Leopold*, 239 F.3d at

246.

In the instant matter, Plaintiff argues that she "did report Cory Karanik, but just not as

soon as [Defendants] say[] it should have been reported." Dkt. No. 35-7 at 16. However, once

Plaintiff did complain, Defendants took immediate action to end Mr. Karanik's alleged

harassment by promptly suspending him pending investigation and ultimately firing him.

Defendants have satisfied their initial burden of demonstrating that Plaintiff failed to avail herself

of Defendants' complaint procedures during the eleven-month period of the alleged hostile work

environment for which Plaintiff seeks to hold Defendants liable. Thus, the burden of production

shifts to Plaintiff to come forward with evidence that her failure to report the harassment was

justified.

Defendants argue that Plaintiff has not satisfied her burden of producing evidence that her

delay in reporting Mr. Karanik's harassment was based on a credible fear of suffering an adverse

employment action or being ignored. *See* Dkt. No. 30-11 at 17-19. In response, Plaintiff argues that her fear of retaliation or inaction by Defendants was credible because (1) Defendants took no action in response to Plaintiff's prior complaints regarding Mr. Noyd and (2) Defendants ignored similar complaints about Mr. Karanik's sexually inappropriate behavior from employee Maria Maoine in February 2010. *See* Dkt. No. 35-7 at 16-19.

As the Court discussed above, the undisputed evidence of record demonstrates that Defendants did take action in response to Plaintiff's prior complaints. *See supra* Section III.B.1. As to Ms. Maoine's complaints, the record establishes that on February 26, 2010, Ms. Maoine complained to human resources that Mr. Karanik was "borderline offensive" and described an incident in which Mr. Karanik stood behind her while she was on the telephone with a customer and placed a sign or sticker on the front of his fly. Dkt. No. 36-1 at 13. When Ms. Maoine turned around to face Mr. Karanik, he took the sign off of his fly. *Id.* According to Ms. Petitto, Defendants responded to Ms. Maoine's complaint by performing an investigation that concluded that Ms. Maoine's claim could not be substantiated and therefore did not discipline Mr. Karanik. *See* Dkt. No. 30-8 at 16-19, 43-44. Characterizing Defendants' response to Ms. Maoine's complaint as ignoring or resisting the complaint *arguendo*, Plaintiff's reliance on Defendants' reaction to Ms. Maoine's complaint is nonetheless misplaced. Plaintiff concedes that she had no knowledge of Ms. Maoine's complaint about Mr. Karanik or Defendants' response to it at the time that Plaintiff failed to report Mr. Karanik's conduct. *See* Dkt. No. 30-4 at 61. As such, Defendants' handling of Ms. Maoine's complaint could not have formed the basis for a credible fear by Plaintiff that Defendants would retaliate against her or fail to take her complaint seriously.

Finally, Plaintiff maintains that "it was common knowledge that if you complained to [Defendants] about management, the adverse consequences or the 'black eye' so to speak was

given to the employee, and only the employee, in the form of retaliation for reporting." Dkt. No. 35-7 at 16. However, as Plaintiff has produced no evidence that Defendants took any adverse action against an employee in response to an employee's filing of an harassment complaint, "such conclusory assertions fail as a matter of law to constitute sufficient evidence to establish that her fear [of retaliation] was 'credible.'" *Leopold*, 239 F.3d at 246 (quoting *Caridad*, 191 F.3d at 295).[8] Defendants have therefore satisfied their burden of establishing that Plaintiff unreasonably failed to make use of the available complaint procedures.

Based on the foregoing, the Court concludes that Defendants have established the *Faragher/Ellerth* affirmative defense to vicarious liability for Plaintiff's claim of sexual harassment by Mr. Karanik. Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claim is granted.[9]

---

[8] Plaintiff's argument that Defendants took an adverse employment action against her for complaining about Mr. Noyd by removing her from Mr. Noyd's team, thereby providing Plaintiff with a credible fear that she would face further retaliation if she complained about Mr. Karanik, *see* Dkt. No. 35-7 at 19, is rejected based on the Court's finding *infra* Section III.C.2 that Defendants' reassignment of Plaintiff was not an adverse employment action.

[9] Defendants also argue that any sexual discrimination claim that Plaintiff may allege based on Mr. Noyd's 2009 conduct is time barred. *See* Dkt. No. 30-11 at 23-25. Plaintiff does not respond to this argument other than to state that Plaintiff's claims concerning Mr. Noyd's 2009 comments "[were] part of the Division of Human Rights hearing." Dkt. No. 35-6 at ¶ 17.

> Title VII claims brought in New York are subject to a 300-day statute of limitations for filing with the EEOC. Any Title VII claims that are not encompassed within the administrative complaint or which accrued more than 300 days prior to the filing of the administrative complaint are barred by the applicable statute of limitations.

*Mendez v. City of N.Y. Human Res. Admin.*, No. 04 Civ. 0559, 2005 WL 2739267 (S.D.N.Y. Oct. 24, 2005) (internal citations omitted). It is undisputed that the June 14, 2011 complaint Plaintiff filed with the Division of Human Rights did not reference Mr. Noyd's 2009 comments. *See* Dkt. No. 35-6 at ¶ 17. Furthermore, any claims by Plaintiff related to Mr. Noyd's comments accrued at the latest by November 2009, well more than three hundred days prior to the filing of Plaintiff's

(continued...)

## C.      Retaliation

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).  In order to present a prima facie case of retaliation under Title VII, a plaintiff must present

> evidence sufficient to permit a rational trier of fact to find [1] that [] he engaged in protected participation or opposition under Title VII . . . , [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67.  Thus, in order to establish actionable retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "Material adversity is to be determined objectively, based on the reactions of a reasonable employee," and in context. *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).

---

[9](...continued)
June 14, 2011 complaint.  Plaintiff's claims as to Mr. Noyd's comments would therefore have been untimely even if they had been included in the administrative complaint.  As Plaintiff does not allege a continuing violation theory, the Court agrees with Defendants that any claim of discrimination arising from Mr. Noyd's 2009 conduct is time barred.

Within the Second Circuit,

> [e]mployment actions that have been deemed sufficiently
> disadvantageous to constitute an adverse employment action
> include "a termination of employment, a demotion evidenced by a
> decrease in wage or salary, a less distinguished title, a material loss
> of benefits, significantly diminished material responsibilities, or
> other indices . . . unique to a particular situation." As these
> examples suggest, "[t]o be materially adverse a change in working
> conditions must be more disruptive than a mere inconvenience or an
> alteration of job responsibilities."

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (internal citations omitted)

(quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). "Alleged acts of

retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on

greater significance when they are viewed as part of a larger course of conduct." *Tepperwien*,

663 F.3d at 568.

Here, Defendants do not dispute that Plaintiff engaged in activity protected under Title

VII by complaining of sexual harassment by her managers or that they were aware of the activity.

However, they argue that Plaintiff did not suffer any adverse employment action as a result of her

complaints. *See* Dkt. No. 30-11 at 19-21. Plaintiff claims that she was subjected to the following

adverse employment actions by Defendants: (1) Mr. Noyd's issuance of the November 2, 2009

Stage 3 Final Warning memorandum; (2) Plaintiff's 2010 reassignment to Mr. Karanik's team; (3)

Defendants' insistence that Plaintiff continue to perform door-to-door sales despite her fear of

stalking by Mr. Karanik; (4) Plaintiff's 2011 reassignment to Mr. Stanton's team; (5) Defendants'

changing the type of business customers to which Plaintiff could sell its products and services;

and (6) Defendants' refusal of Plaintiff's request to work inside sales in the Vestal office. *See* Dkt.

No. 35-7 at 19-22.

### 1. The November 2, 2009 Warning

Plaintiff first contends that "[w]ithin a matter of weeks of [Plaintiff's] complaints to [Defendants], she was retaliated against by her manager Paul Noyd through his issuance of a November 2, 2009 memo . . . wherein he states that [Plaintiff] is at a Stage 3/Final Warning of [Defendants'] progressive discipline." *Id.* at 20. Plaintiff further contends that Defendants "condoned and supported this adverse management action . . . without checking or ascertaining that there is no record of any Stage 1 or Stage 2 action involving [Plaintiff]." *Id.*

The Second Circuit has recognized that "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006). Accordingly, "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Id.* The Second Circuit has further explained that "oral and written warnings do not amount to materially adverse conduct in light of our reasoning in *Joseph* . . . , in which we stated that '[t]he application of the [employer's] disciplinary policies to [the employee], without more, does not constitute adverse employment action.'" *Chang v. Safe Horizons*, 254 Fed. Appx. 838, 839 (2d Cir. 2007) (quoting *Joseph*, 465 F.3d at 91). The Second Circuit thus concluded in *Chang* that an employee did not suffer a materially adverse action when her employer issued her warnings consistent with its progressive discipline policy. *Id.*

Here, Mr. Noyd issued Plaintiff a warning consistent with Defendants' progressive discipline policy for Plaintiff's undisputed failure to meet her reduced monthly sales quotas upon her return from maternity leave. *See* Dkt. No. 30-2 at 34. Although Plaintiff disputes that she received the Stage 1 counseling or Stage 2 written warning required by Defendants' progressive discipline policy prior to receiving Mr. Noyd's Stage 3 warning, she does not dispute that she did

not proceed to the termination stage of the disciplinary process or otherwise face further discipline as a result of the warning.  As such, Defendants' issuance of a warning regarding Plaintiff's poor sales performance did not constitute a materially adverse employment action.

### 2. *The Reassignment to Mr. Karanik*

Plaintiff next argues that Defendants' reassignment of Plaintiff to Mr. Karanik's Syracuse-based sales team after Plaintiff complained about Mr. Noyd was "a calculated adverse employment action" because Defendants "[knew] that [Plaintiff would] not be able to fully participate as a member of that sales team."  Dkt. No. 35-7 at 20.

The Second Circuit has held "that an involuntary transfer may constitute an adverse employment action if the plaintiff 'show[s] that the transfer created a materially significant disadvantage' with respect to the terms of her employment."  *Williams*, 368 F.3d at 128 (quoting *Galabya*, 202 F.3d at 641); *see also Galabya*, 202 F.3d at 641 ("[A] transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.").  On the other hand, "'[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action.'"  *Williams*, 368 F.3d at 128 (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532-33 n.6 (10th Cir. 1998)); *see also Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) ("[A] purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.  A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.").  Furthermore, "an indirect and minor effect on commission income . . . is not sufficient to transform a lateral transfer into a demotion." *Bristol-*

*Myers*, 85 F.3d at 274.

In the present matter, the only change in working conditions that Plaintiff attributes to her reassignment to report to Mr. Karanik is that reporting to a Syracuse-based manager precluded Plaintiff from fully participating in sales meetings. *See* Dkt. No. 35-7 at 20. First, Defendants aver that the information on sales promotions and product pricing that Plaintiff claims she did not receive by not attending sales meetings was actually provided to employees online, an assertion that Plaintiff does not dispute. *See* Dkt. No. 30-1 at ¶ 31. Second, requiring Plaintiff to report to a manager outside of her office does not constitute a significant change in the conditions of Plaintiff's employment. Plaintiff retained the same job title, responsibilities, salary, benefits, and commission rate as before the transfer. Moreover, Plaintiff has not even demonstrated that her commission earnings decreased as a result of the transfer. Although Plaintiff argues that following the transfer, she did not meet her job performance goals, it is clear from the record that Plaintiff failed to meet her job performance goals long prior to the transfer. *See* Dkt. No. 30-2 at 34 (demonstrating Plaintiff's failure to meet her reduced monthly sales quotas for July, August, September, and October 2009). The Court therefore concludes that Plaintiff's reassignment to Mr. Karanik was not a materially adverse employment action.

### 3. Door-to-Door Sales

Plaintiff further contends that Defendants retaliated against her for reporting Mr. Karanik by forcing Plaintiff to perform door-to-door sales after Plaintiff informed Defendants that she feared Mr. Karanik was following her because she saw him drive by her home and café in 2011. *See* Dkt. No. 35-7 at 21; Dkt. No. 30-5 at 58-59; *see also* Dkt. No. 30-5 at 78 (indicating that Plaintiff never saw Mr. Karanik while performing a sales call, but "saw cars that looked like [Mr. Karanik's and] couldn't say for certain without guessing that that would be him"). However, as

Defendants explain, the performance of sales calls was "the very essence of [Plaintiff's] duties as an Account Executive" prior to Plaintiff reporting the harassment. Dkt. No. 36 at 11-12. Requiring Plaintiff to continue to perform the same job duties that she was required to perform prior to filing a complaint against Mr. Karanik cannot be construed as a materially adverse employment action. *Cf. Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) ("An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." (internal quotation marks omitted) (quoting *Galabya*, 202 F.3d at 640)).

### 4. Plaintiff's Reassignment to Mr. Stanton's Team

Plaintiff next avers that she suffered retaliation "by being assigned to Syracuse based Director Michael Stanton who did not take any required action to work with her to meet her sales performance goals." Dkt. No. 35-7 at 21. As the Court discussed above, assigning Plaintiff to report to a manager based in Syracuse, without otherwise altering the terms or conditions of Plaintiff's employment, does not constitute an adverse employment action. *See supra* Part III.C.2. Plaintiff's reassignment to Mr. Stanton involved "no more than a minor change in working conditions" — namely, communicating with her manager via telephone or email as opposed to face-to-face and being excluded from sales meetings — which does not rise to the level of a materially adverse employment action. *Bristol-Myers*, 85 F.3d at 274. Further, when Plaintiff complained to Defendants that her inability to participate in sales meetings and sales calls was detrimentally affecting her sales performance, Defendants accommodated her request to be reassigned to Mr. Noyd's team. *See* Dkt. No. 30-5 at 68-70. The relatively minor inconveniences that Plaintiff suffered as a result of having temporarily to report to Mr. Stanton rather than Mr. Noyd do not rise to the level of "a 'radical change in the nature of the work'" performed by the employee that the Second Circuit has found to have "constituted 'interference with a condition or

privilege of employment.'" *Galabya*, 202 F.3d at 641 (quoting *Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir. 1980)).

### 5. *Change in Selling Practices*

Plaintiff additionally contends that Defendants "knowingly changed the type of business customer that [Plaintiff] could sell Time Warner products and service to," thereby "placing her on a track to failure, and eventual termination." Dkt. No. 35-7 at 21. Specifically, Plaintiff claims that Defendants directed her to sell only to new businesses that were not existing Time Warner customers, rather than "allowing her to perform inside sales to business customers with whom she had successful experience." *Id.* However, Plaintiff does not dispute Defendants' contention that the change in Plaintiff's customer base was part of a larger Business Class department restructuring that occurred years prior to Plaintiff's complaints. *See* Dkt. No. 30-8 at 60 (describing Defendants' restructure of Plaintiff's department); Dkt. No. 36-1 at ¶ 12 (explaining the change in the telecommunications industry that prompted Defendants to restructure its Business Class department); Dkt. No. 30-5 at 72-73 (describing changes in customer base for Plaintiff's sales team led by Mr. Noyd).

As the Second Circuit has articulated, "the addition of several new responsibilities to [an employee's] job description in connection with a larger restructuring . . . do[es] not . . . rise to the level of an adverse employment action." *Palomo v. Trs. of Columbia Univ.*, 170 Fed. Appx. 194, 195 (2d Cir. 2006). Accordingly, the alterations in Plaintiff's job responsibilities resulting from a department-wide restructure do not qualify as an adverse employment action. In *Palomo*, the employee's retaliation claim also failed because the employee "[did] not rebut[] [the employer's] proffer that any changes in the duties [the employee] was asked to perform were either the result of a departmental restructuring or non-discriminatory responses to the quality of her work."

*Palomo*, 170 Fed. Appx. at 196.  Likewise, here, Plaintiff has not rebutted Defendants' assertion that Plaintiff's job duties changed as a result of the restructuring of her department.

### 6. Refusal to Permit Plaintiff to Work Inside Sales in Defendants' Vestal Office

Finally, Plaintiff avers that Defendants retaliated against her by refusing to grant her request "to work inside the office on Business Class sales even though she was in fear to work outside the office because of Cory Karanik's behavior."  Dkt. No. 35-7 at 21.

To the extent that Plaintiff is arguing that she suffered an adverse employment action because Defendants would not transfer her to an inside sales position, such argument fails because Plaintiff voluntarily chose not apply for the open inside sales positions that Defendants notified her were available in Defendants' Syracuse office.  *See* Dkt. No. 30-5 at 65.  A plaintiff alleging that a failure to promote or transfer constituted an adverse employment action must "allege that she or he applied for a specific position or positions and was rejected therefrom." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998).  This "general rule . . . is subject to modification where the facts of a particular case make an allegation of a specific application a quixotic requirement."  *Id.*  "[T]he exception is narrow and does not pertain simply because an employee asserts that an 'aura of discrimination' in the workplace somehow discouraged her from filing a formal application."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004) (quoting *Brown*, 163 F.3d at 710).  Here, requiring Plaintiff to allege that she applied for the position would be far short of quixotic, as Plaintiff did apply for, was considered for, and received interviews for other positions with Defendants, but voluntarily decided not to apply for the inside sales representative openings in Syracuse.  *See* Dkt. No. 30-5 at 65-67; *cf. Moore v. Metro. Transp. Auth.*, 999 F. Supp. 2d 482, 497 (S.D.N.Y. 2013) (finding that requiring the plaintiff to allege that he submitted an application for a particular vacancy would be quixotic where the

plaintiff submitted a request to his supervisor to be considered for the vacancy and his supervisor prohibited him from submitting a formal application).

Further, Plaintiff contends that Defendants should have permitted her to work an inside sales position in Defendants' Vestal office, but admits that at the time she sought such an accommodation, all of Defendants' outside sales representative positions were located in Syracuse. *See* Dkt. No. 30-5 at 65. Plaintiff provides the Court with no precedent, nor is the Court aware of any, establishing that an employer's refusal to create a new position in an employee's preferred geographic location constitutes a materially adverse employment action. *Cf. Williams*, 386 F.3d at 127-28 (rejecting an employee's argument that her employer's failure to create a management position for the employee in the employee's preferred office was discriminatory where the employee offered no evidence that the employer "ha[d] ever created a position for an employee . . . who sought a transfer for purely personal reasons"); *Piccone v. Town of Webster*, No. 09-cv-6266, 2011 WL 322550, *9 (W.D.N.Y. Aug. 2, 2011) ("Plaintiff, however, admits that this position never existed. Thus, she must demonstrate that the Town intended to create the position but then did not because Plaintiff was a member of a protected class." (citing *Williams v. R.H. Donnelley, Inc.*, 199 F. Supp. 2d 172, 178-79 (S.D.N.Y. 2002), *aff'd*, 368 F.3d 123 (2d Cir. 2004)).

### 7. *Defendants' Actions in the Aggregate*

In addition to each individual action failing to provide a basis for a reasonable jury to conclude that Defendants subjected Plaintiff to materially adverse employment actions, Defendants' actions also fail in the aggregate to comprise materially adverse action. Plaintiff argues that as a result of her complaints, Defendants reassigned her to two remote managers but assigned her back to a local manager at her request, continued to expect Plaintiff to perform the

same job duties as were required of her before her complaints, issued her a written warning for undisputed poor sales performance but took no further disciplinary action even when her sales did not improve, and declined to create an inside sales position for Plaintiff in her desired geographic location. The Court concludes that no reasonable employee in Plaintiff's shoes would have been deterred from engaging in protected activities as a result of Defendants' actions. *See Tepperwien*, 663 F.3d at 572 ("Individually the actions were trivial, and placed in context they remain trivial. Taken in the aggregate, the actions still did not adversely affect [the plaintiff] in any material way. 'Zero plus zero is zero.'" (quoting *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998))).

In light of the foregoing, the Court grants Defendants' motion for summary judgment on Plaintiff's retaliation claim.[10]

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close

---

[10] Defendants also argue that Plaintiff cannot pursue a retaliation claim based upon her transfer to the call center or ultimate termination because Plaintiff did not present those claims to the EEOC or equivalent state agency. *See* Dkt. No. 30-11 at 21. As Plaintiff did not argue retaliation on these grounds or address this argument in her opposition to Defendants' motion for summary judgment, the Court deems any such claim abandoned and will not address it. *See Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 475 n. 16 (E.D.N.Y. 2012) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (internal quotation marks omitted) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 29, 2015
Albany, New York

Mae A. D'Agostino
U.S. District Judge